**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | **CASE NO. 4:25CR110** |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **BERNADEL SEMEXANT** | **)** | |

**BRIEF IN OPPOSITION**

NOW COMES, the United States of America, by and through United States Attorney Margaret E. Heap, and undersigned counsel, and responds in opposition to the defendant Bernadel Semexant's unpersuasive and unsupported claim that his confession to law enforcement was given while in custody, without *Miranda* warnings, and otherwise involuntary. Doc. 56.

## I.    PROCEDURAL HISTORY

On September 4, 2025, Semexant was indicted and charged with enticement of a minor to engage in sexual activity, in violation of Title 18, United States Code, Section 2422(b) (Count One), sexual abuse of a minor, in violation of Title 18, United States Code, Section 2243(a) (Count Two), transfer of obscene material to a minor, in violation of Title 18, United States Code, Section 1470 (Count Three), receipt of child pornography, in violation of Title, 18, United States Code, Section 2252(a)(2), (b)(1) (Count Four), and possession of child pornography, in violation of Title 18, United States Code, Section 2252(a)(4)(B) (Count Five). On April 22, 2026, the Defendant filed a motion requesting a "*Jackson v. Denno* Hearing." Doc. 45. An evidentiary hearing was held on July 1, 2026. After which, upon the Defendant's

request, the Court ordered each party to file a brief in support of their respective positions. Doc. 54. On July 13, 2026, Semexant filed a brief in support claiming his confession to law enforcement should be suppressed. Doc. 56.

## II.   **<u>SUMMARY OF THE DEFENDANT'S MOTION</u>**

At the time of the evidentiary hearing, Semexant appeared to narrow his claim to simply whether his confession was involuntary[1]. However, in his brief, he argues that his confession should be suppressed because he was in custody and was not provided with his *Miranda* warnings and because his confession was involuntarily given. Doc. 56. The facts belie these claims.

## III.   **<u>SUMMARY OF FACTS</u>**:

In September 2024, Star Corporal ("Cpl.") (then detective) Limayri Cruz was assigned to an investigation involving defendant, Bernadel Semexant. Tr.[2] p. 12. The investigation involved allegations that Semexant was having inappropriate (illegal) sexual relations with a minor female, referred to herein as MV. *Id*. On September 10, 2024, Cpl. Cruz met with Semexant outside his residence in Hinesville, Georgia, to serve him with a criminal trespass notice, which gave him legal notice of MV's mother's directive that he was no longer authorized to be on her property. *Id*. at 13.   Cpl. Cruz "advised [Semexant] that there was a criminal trespass warning being issued to him at the request of [MV's mother] due to an investigation into his relationship with [MV]." *Id*. at 14. Semexant admitted Cpl.

---

[1] Semexant's counsel, in framing his motion at the time of the evidentiary hearing concedes that Semexant was "not in custody," and "not under arrest." Tr. at 8. That should have ended the advocacy on the *Miranda* issue.

[2] Tr. refers to the transcript of the evidentiary hearing held on July 1, 2026.

Cruz informed him it was in relation to his "relationship" with MV. *Id*. at 89. Cpl. Cruz specifically told Semexant that there was an allegation or an investigation involving MV. *Id*. Semexant "asked how long the investigation was going to be happening, because he planned to move to Texas …." *Id*. Cpl. The interaction was conversational and cooperative. *Id*. at 15. Later that day, Cpl. Cruz phoned Semexant and asked if he would be willing to come in for an interview the following day. *Id*. at 16. Semexant agreed to do so. *Id*. at 17. Semexant confirmed he would meet at the Hinesville Police Department at 1 p.m. on September 11, 2024. *Id*. Lieutenant/Detective James Snider was assigned to interview him. *Id*. at 18, 31.

Semexant arrived at the police department as scheduled. *Id*. at 17-18. Det. Snider walked him into an interview view that was equipped with audio and video recording capabilities. *Id*. at 31. The recording of the interview was entered into evidence at the hearing as Government Exhibits 1 through 4, and a transcript of the interview as Government Exhibit 5. *Id*. at 10. Prior to entering the interview room, Detective Snider and Semexant engaged in casual conversation about coffee, which can be heard on the video recording as they are walking into the video room. *Id*. at 32 and Exhibit 1. Detective Snider testified that he offered Semexant coffee and water initially, but he declined. *Id*. at 32, 35. Detective Snider sat on the opposite side of the table from the Semexant. *Id*. at 46, Exhibits 1 to 4. Semexant remained in possession of his keys and other personal belongings. *Id*. at 34, Exhibits 1 to 4. The conversation was respectful, calm, and conversational. Tr. p. 33-34, *See also*, Exhibits 1 to 4. Prior to any substantive questioning, Semexant was told "you know, if you, if you ever, if you need to leave, if anything comes up, you know, you wanna

leave, just let me know." Exhibit 5, at 16. At no point during the interview, did Semexant ask to leave, indicate he wanted to stop talking, or request an attorney. *Id.* at 35. Semexant confessed to, in part, having sex with MV multiple times, knowing she was only 15 years old, including in a vehicle by the Training Center on Fort Stewart. *Id.* at 37-38, Exhibit 3-4. The interview was approximately two hours long. *Id.* at 47, Exhibit 1-4. After the interview was completed, Semexant agreed to accompany Detective Snider to show him where he parked his vehicle when he had sex with MV on Fort Stewart's military reservation, as well as to retrieve his phone and other electronic devices from his car and residence. *Id.* at 36. When they returned to the police department, Semexant was shown the rest room upon request, which he used alone, and then departed the police department alone. *Id.* at 40-41. The entire encounter was approximately three and a half hours from start to finish. *Id.* at 74.

Semexant testified that he went to the Hinesville Police Department on September 11, 2024, voluntarily. *Id.* at 90. He described the interaction with Detective Snider as "very friendly." *Id.* at 91. When asked by his counsel if he felt like he "had the ability to not answer whatever Detective Snider is asking," Semexant responded that in the beginning of the interview he "felt like he could talk to him," and that he did know he had the ability to leave. *Id.* at 94. Semexant's testimony was devoid of any facts showing police coercion or action turning an otherwise voluntary interview custodial. A lot of Semexant's remaining direct hearing testimony is contradicted by his recorded interview.

4

## IV. <u>DISCUSSION</u>

### A. Semexant was not in custody and therefore, *Miranda* warnings were not required.

Semexant claims he was subject to a custodial interrogation without being provided with *Miranda* warnings, and therefore his confession should be suppressed.[3] Doc. 56. at 2-6.

In *Miranda v. Arizona*, the Supreme Court held that the government must inform individuals of their constitutional rights when an individual is subject to a "custodial interrogation." 384 U.S. 436, 444 (1966). The right to *Miranda* warnings attaches when custodial interrogation begins. *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). A defendant is in custody for the purposes of *Miranda* when there has been a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 295 (1977). Whether a defendant "was 'in custody' prior to his formal arrest "depends on whether under the totality of the circumstances, a reasonable [person] in [her] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.' " *United States v. McDowell*, 250 F.3d 1354 1362 *quoting United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). *See also, United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989) ("A suspect is considered in custody if a reasonable person would believe that he was not free to leave; for

---

[3] This is at least how the Government is responding to Semexant's claims. However, in his brief (as he has already argued he was not in custody or under arrest), he seems to be stating that because the investigator "could" have read him his *Miranda* rights if he wanted to, his rights were violated. This argument has no substance or value. Any person "could" be read their *Miranda* warnings. This does not equate to a requirement to do so.

example, if the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.").

Semexant misconstrues or ignores this legal standard. He argues "[a]lthough Investigator Snider testified that the Defendant was free to leave at any time, the standard by which this is to be determined is what the Defendant perceived as to his ability to leave." Doc. 56 at 3. He cites as authority for this incorrect standard *Rhode Island v. Innis*, 446 U.S. 291, 298-302 (1980). *Innis* says no such thing[4]. The subjective beliefs of the defendant as to whether the defendant was free to leave are irrelevant. *See Stansbury v. California*, 511 U.S. 318, 323-324 (1994); *see also, Moya, 74 F.3d at 1119* ("The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."); and *McDowell, supra.* at 1362 (A custodial determination "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.")

Under the facts here, it is implausible that a reasonable person in Semexant's shoes would believe he was "in custody." The undisputed facts here belie his erroneous claims. In making his claims, he repeatedly ignores Supreme Court precedent. The Supreme Court has further held:

> The police are required to give *Miranda* warnings only "where there has been such a restriction on a person's freedom as to render him 'in custody.' " Our holding relied on the very practical recognition that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."

---

[4] The focus of the *Innis* case was on what qualified as "interrogation" for the purpose of *Miranda*.

*California v. Beheler*, 463 U.S. 1121, 1124 (1983) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

In stark contrast to Semexant's claims, at the evidentiary hearing, he testified that Detective Snider never raised his voice, did not display a weapon, never told him he couldn't leave, that he was told if he wanted to leave he could, that he never asked to leave, never blocked the door, never put an obstacle in his way, never took his keys from him, that his keys were on the table within arm's reach, never asked for a lawyer, was never placed in handcuffs, an officer never laid hands on him, not even to pat him down, officers were "very friendly," and he came to the police department voluntarily. *Id*. at 107-08, 110-12. As an example, on cross-examination, Semexant testified as follows:

Q: … So let's go back to he didn't block your exit to the room?

A: No, he did not.

Q: He didn't threaten you?

A: No.

Q: He didn't tell you you couldn't leave?

A: No.

Q: He didn't tell you we're going to arrest you?

A: No.

Q: He didn't tell you you're never going home?

A: No.

Q: He did none of those things?

A: None of those things.

Q: In fact, his voice, his conversational tone stayed the same; correct?

A:     Correct.

Q:     He asked questions in the same voice, the same tone as he did from the very beginning?

A:     Correct.

Q:     And you described him as friendly?

A:     Correct.

Q:     And that demeanor never changed; correct?

A:     Correct.

Q:     And, in fact, you, in fact, did go home that evening?

A:     Yes, I did.

*Id.* at 120-21.

Semexant also asserts that he asked for "air." Doc. 56 at 3. He now claims that "air" meant to go outside. *Id.* In the context of his interview, the convenient version he now tells, does not align with the facts. The following exchanged occurred during Semexant's interview:

> *[16:17]*
> **Semexant:** *I'm getting hot. Sorry.*
>
> *[16:18]*
> **Snider:** *That's okay.*
>
> *[16:19]*
> **Semexant:** *I, can I get some water?*
>
> *[16:20]*
> **Snider:** *You want some water?*
>
> *[16:21]*
> **Semexant:** *Yeah.*
>
> *[16:21]*
> **Snider:** *Alright.*
>
> *[16:22]*

*Semexant: Some air maybe?*

*[16:22]*
**Snider:** *Yeah. Well, let me get you some water. I can't get the air to run. Hopefully it'll, it'll start. But I can get you some water. You want cold water?*

*[16:30]*
**Semexant:** *Yes, please*
.
*[16:34]*
**Snider:** *<talking to someone outside the room> Hey, would you mind getting some cold water outta my fridge? For me? The, uh, I just need some cold water.*

*[16:52]*
**Snider:** *Some people at the end of the hallway. So here you are, sir.*

*[16:55]*
**Semexant:** *Thank you.*

Exhibit 5.

This exchanged occurred after Semexant was presented with sexually charged text messages he exchanged with MV. After being confronted with some of the evidence against him, he started to sweat. Exhibit 3. In direct contradiction to Semexant's argument of his now interpretation of what "air" meant, Semexant never corrected Detective Snider when he talked about the air conditioning. It is convenient for him to now attempt to twist this conversation into something it was not. At most, it was a simple misunderstanding, which went uncorrected by Semexant. It is an impossible stretch to take a conversation, that was at most a misunderstanding, and transform it into an involuntary custodial interview.

The facts here do not even remotely equate to a custodial investigation. While there isn't even a factual argument that Semexant was "seized," his argument does not address the parameters of what amounts to a "custodial interrogation." In *United States*

*v. Luna-Encinas*, the Eleventh Circuit held:

> We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement- he will not necessarily be considered "in custody" for Fifth Amendment purposes.
>
> Rather, "a free-to-leave inquiry reveals only whether the person questioned was seized." While "seizure is a necessary prerequisite to Miranda, … a court must [also] ask whether …a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.

603 F.3d 876, 881 (11th Cir. 2010).

Semexant also asserts that investigators had enough to arrest him before their interview, therefore it was custodial. Doc. 56 at 5-6. Whether investigators could have arrested him or not prior to the interview is of absolutely no relevance. Again, Semexant completely ignores binding precedent. "It [is] the compulsive aspect of custodial interrogation and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning." *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976), *citing United States v. Caiello*, 410 F.2d 471, 473 (2nd Cir. 1969). *See also, United States v. Phillips*, 812 F.2d 1355 (11th Cir. 2000) (*quoting Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("…[T]he fact that the [ ] police department and the Bureau had information indicating that appellees had committed a federal offense and through their investigation had intended for appellees to confirm such information through the giving of statements is immaterial to a court's determination of custody because '[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time….")

Semexant next argues that "one cannot voluntarily submit to questioning about a topic unless he knows exactly what that topic is." Doc. 56, at 5. He cites to no authority for this novel assertion. It is simply not the law.

Semexant also repeatedly mentions that Semexant's interview was conducted at the Police Department. Like here, the defendant in *Beheler* argued that because his interview occurred in a police station and he was a suspect, he was entitled to *Miranda*. *Id*. The Supreme Court disagreed acknowledging that it has "explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" In applying the Supreme Court's standard, the Eleventh Circuit in *United States v. Phillips* reversed the trial judge's ruling that the defendants were in custody when, after the police asked them to come to the police station, they were interviewed at the station and made incriminating statements. 812 F.2d 1355, 1360 (11th Cir. 1987). The court also rejected the idea that because the police and the FBI believed that the defendants had violated federal law and hoped they would incriminate themselves, that this somehow contributed to a custodial environment. *Id*. at 1361. *See also United States v. Long,* 866 F.2d at 405 (defendant not in custody when agents came to his home, took him to the police station, and interviewed him prior to informing him of his *Miranda* rights). Further, a subject's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, did not automatically create a custodial situation," even if the interview occurred at a police station. *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (*quoting United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987).

11

Here, the totality of the circumstances establishes that a reasonable person in the Semexant's position would not have felt that his freedom was restrained, even when the interview as at a police station. The Defendant testified that he voluntarily agreed to come to the police department for an interview and at the start of the interview believed he was free to leave. A defendant who "voluntarily accompanied the police to the station house" was not "in custody" *See Tukes v. Dugger*, 911 F.2d 508, 515 (11th Cir. 1990), *cert. denied*, 502 U.S. 898 (1991); *Long, supra.* 866 F.2d at 405 (defendant who "voluntarily accompanied the agents to the police station and, at the completion of the interview, . . . was returned to his home" was not "in custody"). *See also, United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (defendant interviewed in customs inspector's office not "in custody" where "[n]o handcuffs were employed, and no guns were drawn"). Moreover, the Defendant was allowed to leave, which he did. Semexant's subjective claims of convenience now that he felt he couldn't leave as the interview progressed, are of no relevance. The only inquiry is "how a reasonable man in the suspect's position would have understood the situation." *Berkemer*, 468 U.S. at 442. Under the facts here, a reasonable person standard clearly and unmistakenly demonstrates that Semexant was not in "custody" and therefore no *Miranda* warnings were required.

**B. Semexant's confession was voluntarily given; there was no indicia of a coercive environment or police overreaching.**

Semexant next asserts his confession was involuntary. Doc. 56 at 6-17. There is not a hint or a single shred of evidence demonstrating the non-custodial interview of the Defendant was anything other than voluntary. A confession is voluntary if it is "the

product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a statement was voluntarily made, a court must examine "whether the defendant was coerced **by the government** into making the statement: 'The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) (*quoting Colorado v. Connelly*, 479 U.S. 157, 170 (1986)) (emphasis added). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Id*.

In support of his claim of involuntariness, the Defendant asserts that he was not told the purpose of the interview. Doc. 56 at 1, 9-11. He completely ignores that doing so is not required. The Supreme Court stated it "has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today." *Colorado v. Spring*, 479 U.S. 564, 576 (1987). Further, an individual need not be informed of all information "useful" in making his decision or all information that "might … affect[t] his decision to confess." *Moran v. Burbine*, 475 U.S 412, 422 (1986). Further, "we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in **\*577** deciding whether to speak or stand by his rights." *Ibid*.[9] Here, the addition "Accordingly, the failure of the law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to

waive his Fifth Amendment privilege in a constitutionally significant manner." *Colorado v. Spring* at 577.

Factually however, Semexant was well aware of why investigators wanted to interview him. He was completely aware the criminal trespass notice was for the residence where MV lived. He had no doubt about that. Tr. at 108. He confirmed he knew that there was an investigation about the nature of his relationship with MV. *Id*. Furthermore, that he was now prohibited to going to the house with MV resided. *Id*. at 109. He agreed that he had been at MV's residence earlier in the day and MV's mother would not let him inside and would not allow MV to come to the door. *Id*. at 110. To feign cluelessness now does not comport with the facts or common sense.

Furthermore, interview techniques including not being entirely candid with a suspect do not render an otherwise voluntary statement, involuntary. *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) (citations omitted); *see also, Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (observing that misrepresentations by the police are "insufficient [by themselves] to make [an] otherwise voluntary confession inadmissible."); *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Our circuit law rejects a per se rules that statements obtained by police deception must be suppressed."); and *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (deceptions that involve misrepresentations of fact "are not enough to render a suspect's ensuing confession involuntary."). Even leading a target to believe they are not the target of an investigation does not make a confession involuntary. *See, United States v. Bostick*, 545 F.3d 69, 80 (1st Cir. 2008) ("Although the fact that the agents allowed him to believe that he was not under investigation may have made him less

14

guarded and self-protective, that deception alone did not make his statements involuntary." Semexant does not cite a single case that supports his claim that not being explicitly told of the purpose of the interview renders it involuntary. P. 10. That is because there is none.

The Defendant also claims he has PTSD (post traumatic stress disorder) stemming from his military service which ended ten years earlier. Tr. p. 84. He claims this alleged condition renders his confession involuntary. Doc. 56 at 7-9. Under the fact here, this is simply ludicrous. First, his claim of PTSD is simply that, his claim. It is unsupported in any way.[5] The Defendant was a teacher with the House of Prayer church and functioned quite well in everyday life. *Id*. at 105. Further, this information was not conveyed to Detective Snider. While Semexant goes to great lengths to argue Det. Snider should have known enough to ask questions to elicit Semexant's claimed mental health issues, acknowledging that there were unknown to him, to offers no legal basis for such a loose claim. He is simply wrong. It is only when "interrogators [ ] turn[ ] to more subtle forms of psychological persuasion, courts have found mental condition of the defendant a more significant factor in the 'voluntariness" calculus. *See, Spano v. New York*, 360 U.S. 315 (1950). "But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"

---

[5] It should be noted that Semexant's credibility is extremely lacking. As one example, he testified that he was not "confident in [his] English," his "understanding of it," even though he grew up in the United States, was in the military for four years, taught English at the House of Prayer, and his recorded interview and hearing testimony belie such a convenient claim.

*Connelly*, at 164. *See also, United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) (defendant was a functional illiterate, but police did not know that.)

Semexant cites to the *Connelly* syllabus by asserting that "whether a statement is voluntarily given can be determined by looking at a defendant's mental condition," That is not what the *Connelly* Court held. As stated, the Court actually held, "a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional 'voluntariness.'" Of note, Semexant attempts to highlight that when the questions were more direct about his sexual abuse of children, he had a physical response. He wants the Court to attribute this physical response to some sort of PTSD induced reaction. Doc. 56 at 8. Under the facts here, this is an unsupported stretch. Semexant started having a physical reaction to Det. Snider's questions when he was confronted with physical proof of his sexual relationship with a 15-year-old girl in the form of text communications. It was an "I've been caught moment," not a PTSD moment from some claimed military incident occurring more than ten years prior.

He also wants to Court to place weight on this argument calling his responses "robotic." Doc. 56 at 8. The record shows Semexant gave substantive responses, not "robotic." For example, one exchange included the following;

> *[21:40]*
> **Snider:** *Tell me about the first time you had sex with Alajah.*
>
> *[21:44]*
> **Semexant:** *That was in my vehicle. No. Yeah. My vehicle, that time, in my vehicle.*
>
> *[21:50]*
> **Snider:** *Where, where was the vehicle at?*

16

*[21:53]*
**Semexant:** *We were in a parking lot outside of, uh, you know where, uh, the education center is at Fort Stewart?*

*....*

*[24:38]*
**Snider:** *Where else have you had sex with her?*

*[24:40]*
**Semexant:** *and then, um, in the bedroom.*

*....*

*[24:44]*
**Snider:** *At her house?*

*[24:44]*
**Semexant:** *At her house.*

*[24:45]*
**Snider:** *When did you start having sex there?*

*[24:49]*
**Semexant:** *Probably like a few weeks ago. Three weeks ago? Maybe*

*[24:53]*
**Snider:** *three weeks ago.*

*[24:53]*
**Semexant:** *Two, three weeks ago.*

*[24:54]*
**Snider:** *So how often did, would you have sex? So you had sex with her three times in the car from March all the way until three weeks ago.*

*[25:02]*
**Semexant:** *So March, well it wasn't, it was paced out. It wasn't like all of it was in March. It was March and then it was a long way, next time was probably like in June or May. Yeah. May then, um,*

*....*

17

*[36:15]*
**Snider:** *And did she perform oral sex on you?*

*[36:18]*
**Semexant:** *Yes, and I did on her.*

…..

*[36:49]*
**Snider:** *Where would you ejaculate?*

*[36:52]*
**Semexant:** *Um, I, if it wasn't on her, it would be on, on the seat of the car.*

 Government Exhibits 4 and 5.

Semexant also asserts his claimed denial of "air" and water render his confession involuntary. *Id*. at. 11-12. As discussed above, Semexant was unequivocally not denied "air." Semexant had a conversation with Det. Snider about air conditioning in the interview room. His attempt to alter the facts that are clear in his interview video should fail. With regard to water, as explained above, he was offered water or coffee when he entered the interview room, which he declined, he was given water upon request later in the interview room, which he drank quickly and requested another. When he requested another, Detective Snider told him he would get "another one. Just talk to me for just a second. I'll go get you another one." Exhibit 4 and Exhibit 5, at 66. It is simply not factual that Semexant was denied "air" and water. Semexant, once again, incorrectly cites *Rhode Island v. Innis* for the claim that the defendant's subjective perceptions control. Doc. 56 at 11. As explained herein, this is simply not the standard.

Semexant next argues that he was subjected to an "excessive interrogation." Doc. 56 at 12. Two hours is not an excessive interrogation. *See Lumpkins v. Secretary Department of Corrections*, 449 Fed. Appx. 879 (11th Cir. 2011) (Seventeen-hour interrogation including "5 or 6 hour break while the detective interviewed [the defendant's] alibi witnesses' did not render the confession involuntary.)  He also claims the same questions were posed over and over again. This is simply not factually so. See Exhibit 1-4 and Exhibit 5 (Interview Transcript).

What is completely non-existent in the Semexant's brief in support of his motion is any persuasive argument based on existing facts that demonstrate there was some police overreaching to a level that would render the Defendant's confession involuntary. "Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process clause of the Fourteenth Amendment."  *Colorado*, at 165. ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.") *Id*. at 167.

In fact, on cross-examination, as discussed above, Semexant admitted that Detective Snider never raised his voice, did not display a weapon, never told him he couldn't leave, that he was told if he wanted to leave he could, that he never asked to leave, never blocked the door, never put an obstacle in his way, never took his keys from him, that his keys were on the table within arm's reach, never asked for a lawyer, was never placed in handcuffs, an officer never laid hands on him, not even to pat him

down, officers were "very friendly," and he came to the police department voluntarily. Tr. at 107-08, 110-12. The Supreme Court stated:

> [T]he cases considered by this Court over the 50 years since *Brown v. Mississippi* have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."

*Connelly*, 479 U.S. at 163-64.

Bottom line, there must be some police overreaching. There simply is none here.

Exclusion of evidence is a drastic measure, taken only when it serves to deter future misconduct. As the Supreme Court observed "[j]urists and scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence.'" *United States v. Janis*, 428 U.S. 433, 448-49 (1976) (citations omitted).

## V.  CONCLUSION

The record demonstrates Semexant's non-custodial interview was voluntarily given. Wherefore, his motion to suppress his confession should be denied.

Respectfully submitted,

MARGARET E. HEAP
UNITED STATES ATTORNEY

*/s/ Sherri A. Stephan*

Sherri A. Stephan
Assistant United States Attorney