| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR425-110 |
| | ) | |
| BERNADEL JUNIOR | ) | |
| SEMEXANT, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Bernadel Junior Semexant is indicted on one count of enticement of a minor to engage in sexual activity, one count of sexual abuse of a minor, one count of transfer of obscene material to a minor, one count of receipt of child pornography, and one count of possession of child pornography. *See generally* doc. 3 (Indictment). He has filed a motion to suppress statements he made to law enforcement officers. Doc. 45. The Government opposed. Doc. 46. On July 1, 2026, the Court held a hearing on his Motion. *See* doc. 49 (Minute Entry). After that hearing, the Court directed the parties to supplement the Motion and response. *See id.* They complied. *See* doc. 57[1] (Defendant's brief), doc. 59

---

[1] Semexant submitted two copies of his brief. Docs. 56 & 57. They appear identical and they were both submitted on July 13, 2026. For simplicity, the Court cites only

(Government's brief), doc. 60 (Government's corrected brief).[2] Semexant's Motion is, therefore, ripe for disposition.

The charges in this case arise from allegations that Semexant engaged in "inappropriate (illegal) sexual relations with a minor female," between 2023 and 2024. Doc. 60 at 2; *see* doc. 57 at 1. The instant Motion concerns an encounter between Semexant and Hinesville Police officers that occurred in September 2024. *See* doc. 57 at 2. At the hearing, the Court heard testimony from Star Corporal Limayri Cruz of the Hinesville Police Department. *See, e.g.,* doc. 58 at 11. Corporal Cruz testified that she was assigned to investigate reports of Defendant's illegal sexual contact with the minor victim. *Id.* at 12-13. She initially made contact

---

to doc. 57 in this Report and Recommendation. Where the Government's response cites to Defendant's brief, the Court has updated any citations from doc. 56 to doc. 57.
[2] The Court must address several minor procedural irregularities in the Government's response. First, at the hearing, the Court afforded Defendant seven days to file his supplemental brief. Doc. 49. After Defendant was granted an extension of that deadline, the Court explicitly directed him to file his brief by no later than July 13, 2026. Doc. 54 at 2. Consistent with the prior Order granting the Government a seven-day period to respond, the Court explicitly directed the Government to file its response by no later than July 20, 2026. *Id.* at 2. The Government's original brief was filed at 12:08 a.m. on July 21, 2026. *See* doc. 59. Although, technically untimely, the Court will overlook the eight-minute delay. The Government's second response was not filed until 2:24 p.m. on July 21, 2026. Doc. 60. The Government indicates that it filed the second version of its brief to correct citations and typographical errors. *See id.* (docket text). Again, despite the brief delay in the Government's filing, the Court will accept the corrected brief. For purposes of this Report and Recommendation, the Court cites exclusively to the corrected brief, doc. 60.

with him late in the evening of September 10, 2024, at his residence, to serve him a criminal trespass notice, prohibiting him from returning to the minor victim's residence. *Id.* at 13-14. She testified that she "advised him that there was a criminal trespass warning being issued to him at the request of [the minor victim's mother] due to an investigation into his relationship with [the minor victim]." *Id.* at 14. During that conversation, Semexant informed Corporal Cruz that he intended to move to Texas within the month. *Id.* Based on that disclosure, and after she returned to the police station, Cruz called Semexant to request that he come and speak with police. *Id.* at 16-17. Semexant agreed to the interview. *Id.* at 17-18.

The Court also heard testimony from Detective James Douglas Snider, also of the Hinesville Police Department. *See* doc. 58 at 30. Detective Snider was the officer who spoke with Semexant when he appeared at the police station on September 11, 2024, as arranged the prior evening with Corporal Cruz. *Id.* at 30-31. Although Detective Snider testified that he did not remember specific details of their initial meeting, his conversation with Semexant, at the beginning of the recording, about coffee was consistent with his usual practice of offering

interviewees coffee.[3] *Id.* at 32. He testified, as also shown in the exhibits, that the interview took place in a room at the police station and that he and Semexant were seated at a table across from one another. They engaged in small talk for a period of time. After those pleasantries, they discuss the trespass warning and Corporal Cruz's request that Semexant come for an interview.

At the beginning of their substantive discussion, Snider expressly tells Semexant "if you need to leave, if anything comes up, you know, you wanna leave, just let me know." Doc. 50-1 at 16. They discuss his relationship with the minor victim. *Id.* at 16-26, 29-30. Snider brings up reports that Semexant's relationship with the minor victim was "inappropriate." *Id.* at 33. Semexant denies that the relationship was inappropriate and disclaims any sexual aspect to their relationship. *Id.* at 33-34. They then discuss Semexant's giving money and gifts to the minor victim, *id.* at 35-37, the frequency of Semexant's visits to her home, *id.* at 39-41, and what he and the minor victim did during those visits, *id.* at 41-47. They eventually discuss the content of text-message

---

[3] A video recording and transcript of that interview were admitted as exhibits to the July 1 hearing. *See* docs. 50 & 50-1. The Court cites to the transcript, doc. 50-1, below.

conversations between Semexant and the minor victim. *Id.* at 54-59. Eventually, Semexant states that he and the minor victim had a sexual relationship. *Id.* at 66.

After the recorded interview concludes, Detective Snider testified that he, Semexant, and another officer drove to a building located on Fort Stewart where Semexant informed them he had sex with the minor victim. Doc. 58 at 36-38. Semexant then took them to his vehicle, which was parked across the street from the police department, and turned over a cell phone and an Apple watch. *Id.* at 39-40. They then travelled to Semexant's residence where he retrieved and turned over two other cell phones. *Id.* at 40. Semexant then left the police department in his own vehicle. *Id.* Corporal Cruz obtained an arrest warrant and Semexant was arrested at his home on the evening of September 11. *See id.* at 27 (Cruz testimony that she obtained the arrest warrant), 73 (Snider's testimony concerning Semexant's arrest).

Semexant raises two alternative arguments for suppressing all of the statements he made to law enforcement on September 11, 2024. First, he argues that all of the statements must be suppressed because the encounter between Semexant and Detective Snider was a custodial

interrogation and Semexant was never advised of his rights, as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. Doc. 57 at 2-6. Second, he argues that the statements should be suppressed because they were involuntary. *Id.* at 6-14. The Government responds, first, that the encounter was non-custodial and *Miranda* warnings were not required. Doc. 60 at 5-12. It also argues that, because the evidence shows that Semexant's statements were not the result of coercive police activity, they were fully voluntary. *Id.* at 12-20. The Government is correct on both grounds.

"The Fifth Amendment provides to every person a right against self-incrimination, U.S. Const. amend. V, and, correspondingly, requires that trial courts exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010); *see also, e.g., United States v. Woodson*, 30 F.4th 1295, 1303 (11th Cir. 2022). Entitlement to *Miranda* warnings attaches "when custodial interrogation begins." *Luna-Encinas*, 603 F.3d at 880 (quoting *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004)) (quotation marks omitted). The Supreme Court has explained that "the *Miranda*

6

safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Defendant bears the burden of showing that his statements were the result of custodial interrogation.[4] *See, e.g., United States v. Peck*, 17 F. Supp. 3d 1345, 1354 (N.D. Ga. 2014) (noting that courts "have assigned the burden of proof to the defendant seeking to challenge the admissibility of statements in the absence of a formal arrest," and collecting cases); *see also, e.g., United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 n. 23 (N.D. Ga. Feb. 10, 2014)

---

[4] Defendant's response asserts, without any citation to authority, that the Government bears the burden of showing that he "knowingly and intelligently waived his right to counsel." Doc. 57 at 2. The suggestion that Semexant "waived" his right to counsel ignores the conceptually prior question of whether he had any such right. The right to counsel, like the right to *Miranda* warnings generally, accrues when a suspect is in custody. *See, e.g., Miranda*, 384 U.S. at 467 ("[I]n-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."). There simply is no Fifth Amendment right to counsel in non-custodial settings. *See, e.g., United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) ("It is well established . . . that the Fifth Amendment right to counsel under *Miranda* does not vest until a defendant is taken into custody."); *United States v. Mikaiylov*, ___ F.Supp. 3d ___, 2026 WL 1031169, at *4 (D. Mass. Apr. 16, 2026) ("[C]ourts have held that because no Fifth Amendment right to counsel exists when an individual is not in custody, questioning may continue even when such an individual requests an attorney." (citations omitted)). This is merely one instance of what the Government describes as Semexant "misconstruing" or "ignoring" the applicable legal standard. *See* doc. 60 at 6. In order to avoid belaboring the point, the Court has not exhaustively noted the instances in which the brief's—charitably— exuberant advocacy strays across the line of strict legal accuracy.

("[T]he defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.").

"Custody . . . has a specific meaning in the *Miranda* context, one that is different that the ordinary usage of the term." *Woodson*, 30 F.4th at 1303. "A person is 'in custody' for these purposes if he finds himself in circumstances that are thought generally to present a serious danger of coercion." *Id.* (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)) (quotation marks omitted). "[T]hat coercive environment exists . . . when a reasonable person would have understood that his freedom of action was curtailed to a degree associated with formal arrest." *Id.* (internal quotation marks and citation omitted). Courts' evaluation of the coercion question proceeds in two steps. *Id.* "The first goes more to nature and the second more to degree." *Id.* The first inquiry asks whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (quotation and brackets omitted). The second inquiry considers "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."

8

*Id.* In both aspects of the inquiry, coercive circumstances are evaluated objectively; "the actual subjective beliefs of the defendant and . . . officer[s] on whether the defendant was free to leave are irrelevant." *Woodson*, 30 F.4th at 1304 (quotation marks and citation omitted) (citing, *inter alia, Stansbury v. California*, 511 U.S. 318, 323 (1994)).

Semexant argues that his encounter with Detective Snider, in the police station interview room, occurred in *Miranda* custody. Doc. 57 at 3-6. A significant portion of his argument, which relies on his subjective perceptions of the circumstances, *id.* at 3-4, is, as the Government points out, "irrelevant," doc. 60 at 6; *see also, e.g., Woodson*, 30 F.4th at 1304. The relevant circumstances include the fact that Semexant voluntarily appeared for the interview, doc. 58 at 90, that Detective Snider expressly informed him that he was free to leave at any time, *see* doc. 50-1 at 16; doc. 58 at 94, and that he left the station after the interview, doc. 58 at 121.

Although the situation is not identical, the Supreme Court has observed, in a case where the suspect "came voluntarily to the police station, where he was immediately informed that he was not under arrest[, and ] . . . did in fact leave the police station without hinderance,"

9

it was "clear" that the suspect was not in *Miranda* custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The fact that the interview occurred at the police station and that police already suspected Semexant are not dispositive of the custody determination. Doc. 57 at 4-6; *see, e.g., California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("[W]e have explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (citation omitted)). The length of the interview is not either. *See* doc. 57 at 4 (noting "[t]he interrogation lasted for over two (2) hours."); *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) ("To the extent [Defendant] argues that the duration (approximately four hours) converted this inquiry into a custodial interrogation, we are unpersuaded."). Finally, the fact that Detective Snider's questions persisted after Semexant's initial denials does not establish that the interview was custodial. Doc. 57 at 3 (noting that Defendant was "asked the same questions repeatedly, despite having denied all allegations hurled at him in the first half of the interrogation."); *Peck*, 17 F. Supp. 3d at 1365 ("[W]hile the questioning was pointed, it did not rise to the level of repeatedly accusing [Defendant]

of lying, which other courts have found transforms a non-custodial interview into custodial questioning."). The recording, and all of the testimony, including Semexant's, bears out that "the tone of the questioning . . . was conversational, calm, deliberate, and not threatening, and did not convey that compliance was compelled." *Id.* Under the totality of the circumstances, then, Defendant has not borne his burden of establishing that he was "in custody," within the meaning of *Miranda*.

Even when a suspect is not "in custody," the Supreme Court has explained, "[i]t is . . . axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession . . . ." *Jackson v. Denno*, 378 U.S. 368, 376 (1964) (citation omitted). Courts "focus [the] voluntariness inquiry on whether the defendant was coerced by the government into making the statement . . . ." *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005) (internal citation and quotations omitted). Although voluntariness depends upon the totality of the circumstances, "[a]bsent police conduct causally related to the confession, there is no basis for concluding that any state actor has deprived a criminal

defendant of due process of law." *Id.* at 1296 (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)) (internal quotation marks and alterations omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Id.* at 1295-96 (internal quotation marks and citation omitted). Like the analysis of *Miranda* custody, the voluntariness analysis is objective. *See, e.g., Dzionara-Norsen v. United States*, 2026 WL 1593310, at *9 (W.D.N.Y. June 4, 2026) ("[B]ecause the inquiry into voluntariness is an objective analysis, [Defendant's] subjective understanding is irrelevant to the Court's analysis."); *see also Connelly*, 479 U.S. at 165 ("while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."). "Unlike a defendant's burden to establish being in custody, the Government bears the burden of proving that a defendant's statements were voluntary." *United States v. Brown*, 2021 WL 3916845, at *7 (N.D. Ga. Aug. 11, 2021) (citing, *inter alia*, *Missouri v. Seibert*, 542 U.S. 600,

12

608 n. 1 (2004); *Connelly*, 479 U.S. at 168; *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983)).

The Government argues that there was no "coercive police activity," *Connelly*, 479 U.S. at 167, during the events leading to Semexant's September 11 statements. *See* doc. 60 at 19. First, it points out that Semexant's assertion that he was unaware of the nature of the interview is not consistent with the record, *id.* at 13-14; *see also* doc. 58 at 108, and, even if he were, a lack of complete candor does not constitute law enforcement coercion, *see, e.g., United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) ("It is clear, that the police's use of a trick alone will not render a confession involuntary. [Cit.] In cases involving police trickery where a confession has been held involuntary there have been other aggravating circumstances as well." (citations omitted)); *Moore v. Hopper*, 389 F. Supp. 931, 934 (M.D. Ga. 1974) ("Confessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made."). The Government also points out that Semexant's alleged history

of military hazing and Post-Traumatic Stress Disorder cannot constitute coercive police activity, absent some attempt to leverage those conditions. Doc. 60 at 15-18; *see, e.g., United States v. Wagner*, 951 F.3d 1232, 1253 (10th Cir. 2020) (suspects disclosed PTSD and military background did not render confession involuntary where "[t]he record reveals no attempt to influence [Defendant] based upon his military background."). The Government argues that the particular circumstances that Semexant characterizes as denials of "air" and water, are, again, belied by the record, doc. 60 at 18 (citing doc. 57 at 11-12), *see also* doc. 50-1 at 65-66. The record, including the video recording, simply cannot support the conclusion that the brief period in which Semexant expressed that the room's temperature was uncomfortable or the delay in providing a second water, when Semexant had finished a bottle less than two minutes before, *see, e.g.,* doc. 50-1 at 65-66, constitute "coercive conduct," by Detective Sinder. *See, e.g., United States v. Eubank*, 2015 WL 3557493, at *8 (S.D. Ga. Mar. 18, 2015) ("In assessing the voluntariness of a confession the court must determine whether any coercive tactics employed by the police were sufficient to overbear the defendant's will or critically impair his capacity for self-determination." (citations omitted)).

14

Finally, the Government argues that the record belies any contention that the interview was so long and aggressive that it was coercive. *See* doc. 60 at 18-19 (citing doc. 57 at 12); *see also United States v. Badiki*, 2018 WL 7283636, at *10 (N.D. Ga. Dec. 31, 2018) (collecting cases finding interrogations "of similar duration" to two-hour interrogation "to be voluntary," and collecting cases). The record established at the hearing, including the video recording of the interview, is sufficient to bear the Government's burden to show, by a preponderance of the evidence, that no coercive police conduct occurred during the September 11, 2024 interview.

Because Semexant has not established that his September 11, 2024 interview was custodial and the Government has established that he was not subjected to any coercion, his Motion should be **DENIED**. Doc. 45. This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this <u>28th</u> day of July, 2026.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA