**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **Case No. 4:25CR110** |
| | ) | |
| **BERNADEL SEMEXANT** | ) | |
| **Defendant** | ) | |

## DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS

COMES NOW BERNADEL SEMEXANT, Defendant in the above-styled matter, and through his attorney of record hereby files this DEFENDANT'S OBJECTIONS TO THE MAGISTRATE COURT'S REPORT AND RECOMMENDATIONS, showing this Honorable Court as follows:

## CASE BACKGROUND

On September 4, 2025, Defendant was indicted by a federal grand jury and charged with, among other things, Enticement of a Minor to Engage in Sexual Activity, Sexual Abuse of a Minor, Transfer of Obscene Material to a Minor, Receipt of Child Pornography, and Possession of Child Pornography (Doc. 3). The Indictment alleges that some time between November 2023 and July 2024, this Defendant enticed a minor to engage in a sexual act, and Count Two (Sexual Abuse of a Minor) specifically states that the Defendant engaged in a sexual act with a minor During the investigation that led to the charges pending against the Defendant, Detective James Snider of the Hinesville Police Department conducted an unlawful custodial interrogation of the Defendant on September 11, 2024. This interrogation elicited statements from the Defendant that were neither freely nor voluntarily given, in violation of Jackson v. Denno, 378 U.S. 368 (1964). In addition to the interrogation by Detective Snider, Detective Lamiyra Cruz also

corresponded with the Defendant and failed to inform him of the real reasons for their contacting the Defendant. This led law enforcement to unlawfully gather evidence against the Defendant for use in his case and at a future trial.

The Defendant filed a Motion for <u>Jackson v. Denno</u> hearing, and a hearing was conducted on July 1, 2026. After briefs on the evidence were submitted, the Magistrate Judge entered his Report and Recommendations on July 28, 2026 (Doc. 61). The Defendant hereby files his Objections to the Report and Recommendations, and the standard of review is *de novo* (Federal Rules of Criminal Procedure, Rule 59).

<b><u>OBJECTIONS</u></b>

**1.** **THE MAGISTRATE ERRED BY CONCLUDING THAT THE DEFENDANT'S STATEMENTS AT THE SEPTEMBER 11, 2024 WERE NOT MADE DURING A CUSTODIAL INTERROGATION**

The Report and Recommendations incorrectly concludes that the Defendant was not entitled to the protections of <u>Miranda</u> because he was not in a custodial interrogation (Report p. 11). Quite simply, the Magistrate just reached the wrong conclusion, given the "totality of the circumstances" test that is required.

In the Report, the Magistrate separated the totality of the circumstances into individual facts that, when taken alone, are not sufficient *by themselves* to create a custodial interrogation environment. However, the error occurred when the Magistrate failed to consider all of the factors together. In the Report, the Magistrate correctly assesses that the questioning took place in the police station, that the Defendant came to the station voluntarily, that he was told that he could leave once, and that repeated questioning of the same issues was forced on the Defendant until he provided the "correct" answers (Report p. 10-11). The Magistrate addresses each one of these individually, but fails to give a correct summation that while there individual factors alone

2

were not sufficient to constitute a custodial interrogation, when taken together, they do in fact create a custodial interrogation situation where the Defendant's <u>Miranda</u> rights should attach.

It is well-settled that the Fifth Amendment to the U.S. Constitution forbids a person to be compelled to be a witness against himself. <u>U.S. Constitution Amendment V</u>. Where an interrogation is conducted without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his right to counsel. <u>Miranda v. Arizona</u>, 384 U.S. 436, 475 (1966). It is uncontroverted that in this case, the Defendant provided statements to Investigator Snider without the presence of an attorney (nor was the option of having an attorney relayed to the Defendant at any time during questioning). Therefore, the Government is laden with a "heavy" burden to show that the Defendant knowingly and intelligently waived his right to counsel. Given the facts here, the Government cannot meet that heavy burden.

While the Government will likely contend that the protections of <u>Miranda</u> do not apply to the case at bar, the facts clearly point in the opposite direction. Investigator Snider testified at the suppression hearing that even though he could have "Mirandized" the Defendant, he never did so. This is despite the fact that the questioning was being done in the Interrogation Room of the Hinesville Police Department. The mere scene of the questioning strongly implicates this as being an interrogation. The questions were posed to the Defendant in that interrogation room, with only one means of exit being behind the Investigator asking the questions. The questions were also being video recorded, as is any police interrogation by the Hinesville Police Department. Although Investigator Snider testified that the Defendant was free to leave at any time, the standard by which this is to be determined is what the Defendant perceived as to his ability to leave. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 298-302 (1980). The Defendant testified at

the hearing that he felt that he could not leave, and indeed he perceived that he could not leave until the Investigator received the "correct' answers to the questions being posed to the Defendant. This is further corroborated by the fact that the Defendant was subjected to over two (2) hours of interrogation and asked the same questions repeatedly, despite having denied all allegations hurled at him in the first half of the interrogation. The Defendant had no prior exposure to police questioning, which again was testified to by Investigator Snider and the Defendant at the suppression hearing. This perception that he was unable to leave was directly supported by statements by Investigator Snider during the investigation that refused the Defendant the ability to get some "air," during the interrogation. (Government's Exhibit 3 at 16'22"). The Investigator and the Government tried to play this request for air off as a misunderstanding about the air conditioning in the room, but the appropriate inquiry under Innis is what the Defendant perceived about his ability to leave based on the circumstances in front of him. The Defendant was perfectly reasonable in his perception that his inability to get air meant that he could not leave the room until Investigator Snider told him that he could do so. Therefore, the Defendant's perception that he could not leave voluntarily renders the interrogation as a custodial interrogation to which the protections of Miranda should apply.

Furthermore, while the Government may try to argue that the Defendant was not the subject of a custodial interrogation, the facts surrounding the interrogation suggest otherwise. The Defendant was alone, without an attorney or any other member of his family. He was in the Hinesville Police Department's interrogation room, and he was being video recorded. He was there in that room with Investigator Snider, a law enforcement officer. The Defendant had never been interrogated by the police before, as he stated on the video and in his testimony at the suppression hearing. The interrogation lasted for over two (2) hours. This has all the classic

elements of a custodial interrogation, and therefore the Defendant should have been read his Miranda rights prior to any statement. The failure of the investigator to do so renders his entire statement unlawful and in violation of the Defendant's Fifth Amendment rights.

The courts have held that the proper inquiry as to whether the Defendant was in a custodial interrogation stems from how "police-dominated" the atmosphere surrounding the questioning was. Berkemer v. McCarty, 468 U.S. 420, 421 (1984). In Berkemer, the Supreme Court held that the defendant was not in custodial interrogation when he spoke to officers at the scene of a traffic stop because it was "temporary and brief" and "roadside detentions last only a few minutes" with the motorist's expectation that "in the end, he most likely will be allowed to continue on his way." Berkemer at 437. That Court correctly noted that "…questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." Berkemer at 438. It was also noted that the detention in Berkemer was "public," and therefore less of a custodial interrogation atmosphere. Id.

The situation at present is wholly different from the questioning in Berkemer. Here, the Defendant's interrogation was not in public but rather at the police station in a formal interrogation room. It was not temporary and brief—it was over two (2) hours long. It was the definition of a police-dominated atmosphere. Any suggestion that the Defendant submitted to this questioning freely and voluntarily is refuted by the Defendant's own testimony, as well as that of Investigators Cruz and Snider, that he was not told that the interrogation was to cover anything beyond the criminal trespass notice that was issued the previous night. One cannot voluntarily submit to questioning about a topic unless he knows exactly what that topic is. When

5

questioned at the suppression hearing about how this would have changed his actions, the Defendant testified that he would not have voluntarily come to the police station and answered any questions if he knew that the scope of them would be to investigate an improper sexual relationship between himself and the alleged victim in the case. Therefore, there certainly was no voluntary waiver on the part of the Defendant.

The Government's likely argument that this interrogation was merely a part of the initial police investigation into the Defendant's possible criminality was likewise refuted by the Government's own witnesses at the suppression hearing. Investigator Snider plainly testified that the application for an arrest warrant for the Defendant was made by Investigator Cruz on information that she had previously and independently of the Defendant's custodial interrogation. Investigator Cruz did not even attend the interrogation, nor was there any testimony that she was briefed as to what the Defendant had stated during that time. The information that Investigator Cruz relied on to secure an arrest warrant was already in her possession before the interrogation. She used that information to successfully apply for the Defendant's arrest warrant. Therefore, any argument that the warrant application was based even in part on the Defendant's interrogation statements is clearly baseless. He was as guilty before he spoke to Investigator Snider as he was afterwards (or at least as guilty as would support a probable cause finding). The Defendant therefore should have been Mirandized before any questioning began, and the attempt to question him while already possessing sufficient evidence to apply for a warrant application is a ruse that flies in the face of the important Miranda safeguards. The only just action therefore is to suppress all of the statements made by the Defendant at his custodial interrogation.

**2.** THE MAGISTRATE ERRED BY CONCLUDING THAT THE DEFENDANT'S STATEMENTS AT THE SEPTEMBER 11, 2024 WERE FREELY AND VOLUNTARILY MADE BY THE DEFENDANT

Furthermore, the Magistrate incorrectly concluded that the Defendant's statements were freely and voluntarily made (Report p. 15). The Magistrate erred in finding that there were no coercive tactics used by the investigators in getting the Defendant to make his statements.

The Defendant's statements to Investigator Snider at the September 11, 2024 interrogation were not freely and voluntarily made. Through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, "it is a depravation of due process of law to base a conviction in whole or in part on a coerced confession, regardless of its truth…" Jackson v. Denno, 378 U.S. 368, 376 (1964). The gravamen of a coerced confession is "coercive police activity," Colorado v. Connelly, 479 U.S. 157 (1986), and whether a statement is voluntarily given can be determined by looking at a defendant's mental condition (Connelly at 158), whether he was informed of the subject matter of the interrogation, whether he was read his Miranda rights or not (United States v. Washington, 431 U.S. 181, 188 (1977), and factors such as the length of interrogation, the scene of the interrogation, any physical deprivations of liberty during the interrogation, and other factors that would lead to a finding of coercive police activity, as perceived by the defendant. The Government must prove that a statement was freely and voluntarily given by a preponderance of the evidence standard. Lego v. Twomey, 404 U.S. 477 (1972).

In the case at bar, there is no way that the Government can meet its burden to show that the September 11, 2024 statements were provided voluntarily by a preponderance of the evidence for the following reasons:

1.  The Defendant's Mental State and his Laboring Under Post-Traumatic Stress Disorder Renders his Statements Unvoluntary.

At the suppression hearing, the Defendant testified that he has been under continuous care for post-traumatic stress disorder (PTSD) through the Veterans' Affairs Medical Center since he was discharged from the Marines many years ago. The Defendant further testified about prior "hazing" incidents in which he was put in a room and forced to endure grueling conditions until the "correct answer" was given to his superiors. Given this information, it is no surprise that the September 11, 2024 interrogation of the Defendant triggered his PTSD and caused his statements to be made involuntarily.

The inference that the Defendant's PTSD was not disclosed to Investigator Snider during the interrogation does not act to make the Defendant's statements any more voluntary. First of all, Investigator Snider and the Defendant had an in-depth discussion early in the interrogation about the Defendant's military service (Government's Exhibit 1). This should have thrown up a red flag to Investigator Snider, or any law enforcement officer, that there was the possibility of a mental condition that could be triggered and affect the Defendant's answers. For some reason, Investigator Snider did not see fit to investigate whether it was possible for the Defendant to provide a statement voluntarily under the interrogation method used. Investigator Snider testified that he had done police interrogations before, and he therefore should have used his prior experience (and his own prior military service) to inquire further about any mental or psychological effects that the Defendant had from his time in the Marines. His failure to do so renders the Defendant's statements involuntary because of his mental state.

Even assuming *arguendo* that Investigator Snider could not have known about the Defendant's mental incapacity at the time of the interview, he certainly noticed physical changes during the interview that should have led him to investigate further or stop the interrogation. At

8

the hearing, Investigator Snider testified that after about an hour of interrogation, the Defendant appeared to be having a physical episode that included severe sweating, redness in appearance, restlessness, shiftiness, and other physical issues. Investigator Snider assumed that this was because he had confronted the Defendant with incriminating materials during this part of the interview, but his testimony made it clear that this was more than just a feeling of "being in the hot seat." Investigator Snider testified that at this point in the interview (which consists of Exhibits 3 and 4 of the Government's exhibits), he noticed a complete change in the Defendant's demeanor and it was like the Defendant was a completely different person. He then essentially described a wholly different person than had been present during the first hour of questioning. It is not hard to understand why; the Defendant was experiencing his PTSD triggers of being forced to answer questions the "right" way in a situation that was highly-controlled and coercive. That his answers were given as a result of his PTSD trigger is obvious from the answers themselves. An overwhelming amount of responses that the Defendant gave to Investigator Snider was a simple "mm hmm," (Government's Exhibit 5). These methodical and almost robot-like responses demonstrate that at the time of their being given, the Defendant was under such a strong mental infirmity that he lacked the ability to speak freely and voluntarily.

Under the totality of the circumstances, if someone is suffering from a mental or intellectual disability during police questioning, it will render a confession involuntarily given. *See* United States v. Preston, 751 F.3d 1008, 1010 (9th Cir. 2014), *holding* that a confession that was made by a defendant with an intellectual impairment was involuntarily made based on the impairment and the totality of the circumstances. In the case at bar, there is strong evidence to show that the Defendant experienced a debilitating PTSD episode during the police questioning that either could have been known by the investigator prior to questioning or was known by him

9

during the interrogation, yet it was allowed to continue and incriminating statements were forced out of the Defendant. Therefore, these statements, especially the ones made after the one-hour mark when the PTSD episode manifested itself in a noticeably physical form (from Exhibit 3 onward), must be suppressed.

2. The Defendant was not Informed of the Subject Matter of the Interrogation.

There was extensive testimony at the suppression hearing that the Defendant was not told that his interrogation by Investigator Snider would be concerning an inappropriate sexual relationship with a minor victim. Detective Cruz testified that she served a criminal trespass warrant on the Defendant on the day before (September 10, 2024) and that she subsequently called him to ask if he would come to the Hinesville Police Department to discuss the matter with her. She never testified that she told the Defendant that she wanted to question him about anything beyond the trespass notice circumstances. The phone call in which she relayed that request to the Defendant was very brief by both her testimony and the Defendant's own account.

The Defendant was perfectly reasonable in assuming that he was going to the Hinesville Police Department to discuss only the criminal trespass matter, since that was all that had been mentioned to him. When he arrived at the Police Department, Detective Cruz was not there. However, Investigator Snider picked up where Cruz left off. Again, the intent behind the Defendant speaking with the investigator is obvious from his statements. When asked why he was there, the Defendant stated clearly that he was there to "sign the criminal trespass warning." (Government's Exhibit 1 at 19'59"). Investigator Snider confirmed the Defendant's belief as to why he was there by asking "Did you understand the paperwork that Cruz gave to you?" (Government's Exhibit 2 at 23"). It was not until approximately fifty-one (51) minutes into the questioning that Investigator Snider took issues beyond the scope of the criminal trespass matter

by asking the Defendant if there was an inappropriate relationship between himself and the alleged victim (Government's Exhibit 2 at 16'30"). However, from that point forward, all of the police questioning is targeted at whether there was an unlawful relationship between the Defendant and the minor and whether the Defendant would admit to performing unlawful sex acts with her. This in no way had to deal with the criminal trespass issue; this was the basis for much more serious criminal charges.

In order for a statement to be freely and voluntarily given, it cannot be coerced. Jackson v. Denno, 378 U.S. 368, 378 (1964). It belies common sense to think that the Defendant in this case could be speaking feely and voluntarily about a topic that he had no advance notice that he would be questioned about. The simple fact is that the police in this case used the criminal trespass issue as a ruse to get the Defendant to come into the police station voluntarily to talk to them about a much more serious issue: a possible sexual relationship with a minor. In order to avoid the appearance of coercion, Investigators Cruz and Snider should have told the Defendant that they had questions beyond those concerning the criminal trespass issue. They did not do so. Therefore, the Defendant's statements, especially those that were beyond the scope of the criminal trespass issue (Exhibits 3 and 4) should be suppressed because they were not voluntarily made.

3. The Defendant was Denied Air and Water, and He Had the Subjective Belief that He Could Not Leave the Interrogation Room during the Interrogation.

While the Defendant was being interrogated on September 11, 2024, he was denied access to both air and water, despite asking directly for both. During his testimony, the Defendant stated that he asked for some air, and he was not allowed to leave the interrogation room to get any. This is confirmed in the videos of the interview (Government's Exhibit 3,

11

16'22"). While Investigator Snider tried to say that he thought the Defendant was talking about the air conditioning and therefore he said that could not do that, it is clear that in the Defendant's head, he reasonably determined that the Investigator meant that the Defendant could not go outside the room to get a breath of fresh air. The correct inquiry is not whether Investigator Snider thought the Defendant meant, but rather what the Defendant thought about it, since the standard is whether he perceived if he had the ability to leave or not. Rhode Island v. Innis, 446 U.S. 291, 298-302 (1980). The fact that he was seemingly denied air is strong evidence that he was not free to leave, and therefore the Defendant did not make his statements voluntarily.

Additionally, the Defendant was denied water by the investigator until he answered questions. The defendant in Jackson v. Denno was refused water and told that he would not be left alone until the police had the answers they wanted. Jackson v Denno, 378 U.S. 368, 372 (1964). That was found by the court to constitute part of a coercive and police-domineering environment that rendered the defendant's statements there involuntarily made. There are numerous other cases in which the denial of water has been held to be a factor in whether a questioning was freely and voluntarily done, including Miranda itself. Here, it is just one factor in the overall scenario that led to a coercive questioning environment.

In this case, it was uncontroverted that the Defendant asked Investigator Snider for more water, whereupon he was told by the Investigator that the Defendant should "just talk to me for a second and I'll go get one." (Government Exhibit 3 at 18'37"). The Defendant even went so far as to tell the Investigator that he was dizzy, yet the Investigator kept asking questions. (Government Exhibit 3 at 19'18"). This denial of water, combined with the denial of air and the continuation of questioning even though the Defendant was having a full-on PTSD episode and was dizzy, all constitute a very controlled interrogation that resulted in statements that were

coerced out of the Defendant. Therefore, the Defendant's statements given to Investigator Snider, especially those statements on Government's Exhibits 3 and 4, which occurred after the denial of air and water, should be suppressed.

4. The Defendant was Subjected to Excessive Interrogation Because the Interview Lasted Two Hours and the Questions Were Repeated Until the "Correct" Answer was Given.

Additionally, the actual interrogation time that the Defendant was subject to was excessive in length. It was over two (2) hours long! While this length of interview may not be days and days as in other cases, it is an excessively long time to discuss a criminal trespass matter with a suspect. Of course, the reason the interrogation took so long is because Investigator Snider had no intention of merely discussing the trespass issue and letting the Defendant go. Rather, he wanted to (and did) get into all the particulars about how the Defendant knew the alleged victim, what kind of access he had to her bedroom, and ultimately if he would confess to having committed a sex crime against her. (Government's Exhibits 3 and 4). This is way beyond the scope of questioning that the Defendant expected when he was asked to come into the station to talk to Investigator Cruz about the criminal trespass. Therefore, all of his statements on these two tapes should be suppressed.

It should also be noted that the same questions about the Defendant's relationship and actions with the alleged victim were posed over and over again to try and get the "correct" answer out of the Defendant. The Defendant testified at the suppression hearing that he felt as though he had to tell Investigator Snider what he wanted to hear or he would not be able to leave. This feeling was justified by the fact that Investigator Snider made the Defendant answer the same questions two and three times (usually in the affirmative, eventually), despite the fact that the Defendant categorically denied any wrongdoing in the first hour of the interrogation

13

(Government Exhibits 1 and 2). This constant repetition of questions led to forced admissions by the Defendant, which is evident in his "mm hmm" responses. It took any voluntariness out of the Defendant's statements, and therefore all of the Defendant's statements (and certainly those on Government Exhibits 3 and 4) should be suppressed, just as they were in <u>Jackson v. Denno</u>, because they were the result of merely giving the police the answers they wanted. <u>Jackson v. Denno</u>, 378 U.S. 368, 372 (1964).

5. The Investigator Resorted to Tricky Tactics to Get the Defendant to Talk During the Interview.

Investigator Snider definitely used some police tricks while interrogating the Defendant, and therefore the statements should be suppressed under the <u>Jackson v. Denno</u> standard. It is well-established that it is the "attitude of our society that important human values are sacrificed where an agency of the government…wrings a confession out of an accused against his will." <u>Blackburn v. Alabama</u>, 361 U.S. 199, 206-207 (1960). Therefore, the investigators should merely ask the questions after notifying the defendant of his rights to remain silent.

A casual look at the questioning by Investigator Snider reveals an attempt to not only downplay the questions as "just talk" (Government's Exhibit 3 at 18'39") and encourage the Defendant just to "talk to us" (Government's Exhibit 1 at 5'27"), but also it was an attempt to build the Defendant up and put him in a posture where the Defendant felt that he had to talk or he would be "letting the investigator down." The language of "you're a likeable guy" (Government's Exhibit 3 at 15'21"), "do the right thing" (Government's Exhibit 3 at 25'43"), "I think you've been honest" (Government's Exhibit 4 at 24'07"), and "You're a smart man" (Government's Exhibit 4 at 27'47") serve only to try and force the Defendant to talk by the investigator validating the second set of answers that the Defendant gave to the questions. It's

14

tantamount to saying "hey, it's alright—you can tell me; I won't be mad."  It is downright trickery and the fact that it was tried by Investigator Snider in a serious felony investigation is appalling.  At a minimum, it forced the Defendant to speak because he felt incentivized to do so (to protect his character as a "good guy").  In reality, it caused the Defendant to fall into a trap of seeming like he was just talking to a friend.  This trickery produced involuntary statements by the Defendant that must now be suppressed.

6.   The Defendant was not Read his Miranda Rights Despite the Fact That he Should Have Been So Advised.

As laid out above, the Defendant should have been read his <u>Miranda</u> rights prior to any interrogation by Investigator Snider.  Investigator Snider testified at the suppression hearing that he *could* have read <u>Miranda</u> rights to the Defendant, but he did not do so.  The Defendant testified that, had he been given those rights at the start of the interrogation, he would have better understood the seriousness of the questioning and he would have invoked his Fifth Amendment right not to testify against himself.  While the evidence is clear that this was a custodial interrogation, even if it was not, the reading of <u>Miranda</u> rights could have been done.  That simple act would have negated any argument that the Defendant's statements were not freely and voluntarily made.  Indeed, it is "…only through an awareness of these consequences (that anything said can and will be used against the individual in court) that there can be any assurance of real understanding and intelligent exercise of the (Fifth Amendment) privilege…" <u>Miranda v. Arizona</u>, 384 U.S. 436, 469 (1966).  As it is, the evidence is unclear at best as to whether this Defendant knew that he had the right not to incriminate himself and that, by continuing to talk to Investigator Snider, he was waiving that right.  Because the right against self-incrimination is so fundamental and protected, the only just outcome here is to suppress all of the Defendant's

statements (or at least all of those on Exhibits 3 and 4, which cover a different topic than the Defendant voluntarily came to the Hinesville Police Department to talk about).

<u>**CONCLUSION**</u>

Therefore, given that his statements to Investigator Snider at the September 11, 2024 were made involuntarily and were not freely given, the Defendant hereby respectfully requests that this Honorable Court suppress all statements that he made to the Investigator that day. In the alternative, the Defendant believes he is entitled to a suppression of all statements that were made on Government's Exhibits 3 and 4, as they were outside the plausible scope of any voluntary waivers of his Fifth Amendment rights that the Defendant may have knowingly made. The Defendant respectfully requests that this Honorable Court Order the matter to be returned to the Magistrate with the correct decision that the Defendant's statements should be suppressed as a matter of law.

Respectfully submitted this 11th day of August, 2026.

W. Joseph Turner
Attorney for Defendant
State Bar No.: 513605

The Turner Firm, LLC
Attorneys at Law
104 W. State Street, Suite 230
Post Office Box 8905
Savannah, GA 31412
T: (912) 226-7662
F: (912) 226-7664

## CERTIFICATE OF SERVICE

I hereby certify that this day I have served counsel for all parties with a copy of the foregoing pleading by filing through the CM/ECF system.

This ‗11th day of August, 2026.

W. Joseph Turner
Attorney for Defendant
State Bar No.: 513605


The Turner Firm, LLC
Attorneys at Law
104 W. State Street, Suite 230
Post Office Box 8905
Savannah, GA 31412
T: (912) 226-7662
F: (912) 226-7664